In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Edward G. HARRIS, Attorney at Law:

OFFICE OF LAWYER REGULATION, Complainant,

v.

Edward G. HARRIS, Respondent.

Supreme Court

*No. 02–0464–D. Decided March 28, 2003.*

2003 WI 22

(Also reported in 658 N.W.2d 451.)

¶ 1. PER CURIAM. We review the referee's recommendation that the license of Attorney Edward G. Harris to practice law in Wisconsin be suspended for two years for professional misconduct in connection with repeated instances of unauthorized practice of law in violation of SCR 22.26(2).[1] In addition to license suspension, the referee recommended that Harris be required to pay the costs of this proceeding and that any reinstatement of his license to practice law be conditioned upon Harris satisfying certain civil judgments that were lodged against a former client and against Harris, himself, as a result of Harris's misconduct.

¶ 2. We agree that Harris's professional misconduct was serious. We are persuaded that a two-year suspension of his license to practice law in Wisconsin is appropriate discipline for his misconduct, and we adopt the referee's recommendation in this regard. In addition, we direct Harris to satisfy the civil judgments, lodged against his aggrieved client, Robert M. Trotter, and against himself, as set forth herein. Finally, we order Harris to pay the costs of this proceeding.

¶ 3. Attorney Harris was admitted to the practice of law in Wisconsin in 1986. He has no prior disciplinary history. However, his license to practice law in

---

[1] SCR 22.26(2) provides:

(2) An attorney whose license to practice law is suspended or revoked or who is suspended from the practice of law may not engage in this state in the practice of law or in any law work activity customarily done by law students, law clerks, or other paralegal personnel, except that the attorney may engage in law related work in this state for a commercial employer itself not engaged in the practice of law.

Wisconsin has been under suspension since 1997 for failure to complete Continuing Legal Education (CLE) requirements.

¶ 4. On February 18, 2002, the Office of Lawyer Regulation (OLR) filed a complaint against Harris alleging that Harris engaged in the unauthorized practice of law from the date of his suspension "until at least February 8, 2001." The OLR further alleged certain misconduct committed by Harris related to his representation of three clients.

¶ 5. Harris admitted some of the allegations and denied others. However, he failed to respond to requests for admissions and other discovery requests. Despite proper notice, he also failed to appear at a hearing on a "Motion to Adjudicate" filed by the OLR in response to Harris's discovery violations. Ultimately, Harris also declined to appear at the hearing on the merits of the disciplinary matter, advising the referee that he did not contest any of the OLR's allegations and would not challenge the request to suspend his license for two years.

¶ 6. Consequently, the evidentiary hearing on the merits of this disciplinary matter proceeded without Harris. The OLR introduced witnesses and exhibits and provided argument in support of its request for a two-year suspension. Based on the pleadings, Harris's admissions, and the evidence submitted at the hearing, the referee made findings of fact, which are summarized herein.

¶ 7. Beginning in October 1996 the Board of Bar Examiners (BBE) advised Harris that he needed to report his compliance with CLE attendance requirements. Harris never responded to the BBE and failed to establish his compliance with CLE attendance require-

ments. Accordingly, he was suspended, effective June 3, 1997. It is undisputed that he was aware of the order of suspension.

¶ 8. Nonetheless, the evidence indicated and the referee found that Harris continued to practice law after the effective date of his suspension.

¶ 9. From June 4, 1997, until February 8, 2001, Harris continued to practice law at the firm of Piano, Harris & Tishberg in Milwaukee, Wisconsin. Harris continued to handle at least 60 cases in Wisconsin courts after the effective date of his suspension.

¶ 10. On September 26, 1997, Harris advised the BBE staff that he had received a letter from a judge regarding his suspension. He asserted that he had already filed a written report with the BBE establishing his compliance with CLE requirements. In fact, no such report was ever received by the BBE.

¶ 11. In October 1999 opposing counsel in a matter informed Harris that he had learned of Harris's suspension and that he would need to discuss the matter with the court. Harris told the presiding judge that he believed his suspension was a mistake and that he would resolve it. However, Harris did not attempt to resolve the matter with the BBE.

¶ 12. In December 2000 the OLR wrote Harris asking him to respond to an allegation that he had been practicing law after the date of his suspension. Harris did not respond to this letter.

¶ 13. In January 2001 the OLR mailed a second letter to Harris via certified mail, again asking him to respond to the allegation that he had practiced law while under suspension. Harris did not answer this letter, either.

¶ 14. Based on the foregoing findings, the referee concluded that Harris engaged in the unauthorized practice of law in violation of SCR 22.26(2).

¶ 15. The referee also made findings regarding the OLR's allegation that Harris committed misconduct in the course of his representation of three separate clients, over and above the finding that he engaged in the unauthorized practice of law.

¶ 16. In August 1997 Howard McMahon, an attorney (McMahon), referred his cousin, Shawna Miller, and her husband, Jeremy (the Millers), to Harris to commence a "lemon law" action against Saturn of Eau Claire. McMahon mailed Harris all of the documents relevant to the Millers' claim. He asked Harris to review the materials and to give him an opinion regarding the Millers' claim. Although his law license had been suspended, Harris agreed to represent the Millers and subsequently did so.

¶ 17. One of the documents that McMahon sent to Harris was a form to request arbitration through the Better Business Bureau Auto Line. Harris told McMahon and Jeremy Miller that he had filed for arbitration with the Better Business Bureau Auto Line. He further indicated that the arbitration process was subject to lengthy delay and that it would take some time for the Millers to obtain a hearing date. In fact, Harris never filed such a claim.

¶ 18. In early 1998 Jeremy stopped making the lease payments because he was continuing to experience problems with his vehicle. General Motors brought a small claims action against the Millers in the Circuit Court of Dane County, Case No. 98–SC–2790. Harris entered an appearance on behalf of the Millers and filed an answer to General Motors' complaint.

¶ 19. After the General Motors' lawsuit against the Millers had been filed, Harris explained to the Millers and McMahon that he believed this new lawsuit provided an ideal means of bypassing the arbitration provisions of the lemon law statute. Harris further informed them that he would file a counterclaim for the lemon law violations in this Dane County action and thereby move the dispute to circuit court. In fact, Harris did not file any such counterclaim.

¶ 20. In April 1998 the Millers paid the money owed to General Motors, and the Dane County Circuit Court dismissed General Motors' lawsuit.

¶ 21. On July 2, 1998, Harris signed a summons and complaint he had drafted on behalf of the Millers, provided them with copies, and informed them he would file these papers in court. The caption on these documents listed the case number as 98–SC-2790, the same case number as the General Motors' small claims action against the Millers in *Dane* County, but the caption stated "*Milwaukee* County." Harris never filed these documents.

¶ 22. Harris then told the Millers and McMahon he would file a motion for summary judgment and had Jeremy Miller sign an affidavit. The caption on the affidavit listed the case number as 98–SC-2790, the same case number as the General Motors' small claims action against the Millers in *Dane* County, but the caption again stated "*Milwaukee* County." Harris failed to file the affidavit and filed no motion for summary judgment.

¶ 23. Harris then wrongly informed the Millers and McMahon that he had filed a motion for summary judgment and that it would be heard in Milwaukee County on December 20, 1999. Jeremy Miller advised Harris that he would attend the hearing. Shortly before

51

the hearing, Harris informed Jeremy Miller that he had negotiated a settlement and that Jeremy Miller need not appear in court on December 20, 1999. No such settlement was reached.

¶ 24. In February 2000 Jeremy Miller asked McMahon to check on the status of the settlement because Harris was not returning his telephone calls. Harris informed McMahon that the opposing attorney was not returning his telephone calls, and that he would have to make another motion for summary judgment to enforce the settlement. Subsequently, Harris advised McMahon and the Millers that the renewed motion for summary judgment was scheduled for hearing on May 8, 2000. No such motion was ever filed.

¶ 25. In April 2000 McMahon attempted to find the Millers' case using "CCAP" (a court operated computer database that provides public access to circuit court records), but could not locate any record of the Millers' case. McMahon called Harris to obtain an explanation. Harris told McMahon that there must have been a mistake and he would take care of the matter.

¶ 26. In April 2000 McMahon wrote to Harris and asked him to send copies of all papers and pleadings that were filed in the Millers' case. Harris never sent anything to McMahon and never replied to McMahon's letter.

¶ 27. During the period in which he was representing the Millers, Harris failed to return countless phone calls made to him by Jeremy Miller, who was unsuccessfully attempting to obtain information about court proceedings and events that Harris had falsely claimed were happening.

¶ 28. In summary, despite his representations to the Millers and McMahon, Harris never filed any claims

or counterclaims against General Motors, never filed any motions for summary judgment, and never finalized a settlement with General Motors. He never filed any claim or motion in any tribunal on the Millers' behalf.

¶ 29. The referee also made findings regarding the allegation that Harris committed misconduct with respect to another client, Robert M. Trotter (Trotter). In June 1995 Trotter retained Harris to represent him on a claim stemming from an injury that Trotter suffered while working for Paramount Landscape (Paramount) in May 1995.

¶ 30. Initially Harris filed a claim with Heritage Mutual Insurance Company (Heritage), Paramount's workers' compensation insurance carrier. Heritage took the position that Trotter was not an employee of Paramount at the time of the incident and therefore was not entitled to workers' compensation benefits. In 1997 Harris filed an application for workers' compensation benefits on behalf of Trotter with the Wisconsin Department of Workforce Development.

¶ 31. On June 3, 1997, Harris's law license was suspended. Harris never advised Trotter of his suspension and continued to represent him.

¶ 32. Because Heritage continued to deny that Trotter was an employee, on June 6, 1997, Harris filed a negligence claim against Paramount, Anthony Pegg (Pegg), the owner of Paramount, and Heritage in Waukesha County Circuit Court. Trotter also claimed in that action that Mr. Pegg had assaulted him by threatening to harm him if he attempted to file a lawsuit or an insurance claim.

¶ 33. In July 1997 counsel for Paramount and Pegg deposed Trotter in the civil case. Subsequently, in September 1997, they filed a motion for summary

judgment in circuit court. The motion sought either dismissal of the pending civil action or stay of the civil action pending resolution of the workers' compensation claim.

¶ 34. Harris never advised Trotter of this motion for summary judgment and never filed any response to the motion for summary judgment. Harris also failed to appear at the hearing on the motion for summary judgment.

¶ 35. The circuit court granted the motion for summary judgment, dismissing Trotter's claim. Harris never advised Trotter that the court had granted the defendants' motion for summary judgment and had dismissed the case.

¶ 36. Paramount and Pegg then moved for an award of costs against Trotter and Harris on grounds of frivolousness. In December 1997 the court held a hearing on this motion. Harris did not appear at the hearing and never advised Trotter of it. The court awarded Paramount and Pegg attorneys' fees and costs to be assessed equally between Harris and Trotter. Harris never told Trotter of the award rendered against them.

¶ 37. In March 1998 Paramount and Pegg's counsel wrote to Harris asking him whether he and his client would voluntarily pay the judgment entered against them. Harris never responded to this letter and never told Trotter about it.

¶ 38. Meanwhile, Trotter's workers' compensation case remained pending and was scheduled for a hearing on April 2, 1998. Harris advised the Department of Workforce Development that Trotter and Heritage had reached a compromise. On April 4, 1998, Attorney Richard Mueller, who represented Heritage in the workers' compensation action, sent Harris a draft compromise agreement. The compromise provided that

the defendants would agree to vacate the judgment against Trotter and Harris in Waukesha County Circuit Court in exchange for Trotter releasing the defendants from any liability under the Workers' Compensation Act. Attorney Mueller signed the compromise agreement and asked that Harris and Trotter sign the document as well.

¶ 39.   Harris never informed Trotter of the compromise agreement proposed by Heritage Insurance. He did not reply to several letters from Attorney Mueller seeking a response concerning the compromise.

¶ 40.   On October 27, 1998, the administrative law judge wrote to Harris and Attorney Mueller to inform them that he had not received the compromise agreement. He asked counsel to advise him if the matter had been compromised. The next day Harris telephoned Attorney Mueller about the compromise agreement and informed him that it had been signed by Harris and Trotter and returned. Trotter had not signed the agreement. Indeed, Trotter knew nothing about it. Attorney Mueller then sent Harris a letter dated October 29, 1998, in which he advised Harris that he had never received the signed compromise agreement. He provided Harris with a second copy of the agreement. He asked Harris to have it executed and either returned to him, or forwarded to the administrative law judge. It was not.

¶ 41.   On May 10, 1999, the administrative law judge dismissed Trotter's claim, without prejudice. Notice of the dismissal was sent to Harris's office. Harris never advised Trotter that his workers' compensation claim had been dismissed.

¶ 42.   Ultimately, proceeding pro se and later with the assistance of another attorney, Trotter began and eventually compromised a second workers' compensation claim.

¶ 43.   In the Waukesha County action a judgment in the amount of $2716.74 was entered against Trotter, as was a separate judgment against Harris in the same amount. This judgment against Trotter remained outstanding as of the date of the hearing before the referee in this matter.

¶ 44.   In the course of his representation of Trotter, Harris repeatedly failed to return calls or answer inquiries from Trotter and from attorneys Trotter later retained.

¶ 45.   Finally, the referee made findings with respect to the allegations against Harris involving a third client.

¶ 46.   In April 2000 Harris's license to practice law had been suspended for nearly three years. Nonetheless, Harris undertook the representation of Makbul Sajan in Sajan's effort to obtain a special use permit from the City of Milwaukee Board of Zoning Appeals to open a gas station at a certain location. Harris and Sajan met with the alderman of the potentially affected district, exchanged information, and discussed an upcoming meeting. Harris continued to represent Sajan in this matter until at least September 21, 2000, when Sajan's application for a special use permit was denied.

¶ 47.   Based on the foregoing findings of fact the referee concluded that the OLR had established by clear and convincing evidence that:

> 1. By practicing law on and after June 4, 1997, while his license to do so was suspended, Harris repeatedly engaged in the unauthorized practice of law and

56

■

thereby repeatedly violated SCR 22.26(2). He did so specifically in his representation of Jeremy and Shawna [Miller], of [Robert] Trotter, and of [Makbul] Sajan, as set forth in particular above, and of other clients as well.

2. By failing to file any claims on behalf of Jeremy and Shawna [Miller] and by failing to respond to motions filed, and inquiries made, by those adverse to the Millers, Harris failed to act with reasonable diligence in representing them and thereby violated SCR 20:1.3.[2]

3. By failing to respond to numerous communications and requests for information from the Millers and their agents and by repeatedly giving them false information when he gave them any information at all, Harris failed to comply promptly with reasonable requests for information and failed to keep the Millers informed of the status of various matters. He thereby violated SCR 20:1.4(a).[3]

4. By falsely advising the Millers and their agents that he had filed claims and motions on their behalf and that he had reached a settlement of their claims and by repeatedly misrepresenting the existence and status of court proceedings, Harris engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation and thereby violated SCR 20:8.4(c).[4]

5. By failing to respond to claims, motions, and offers of compromise made against and to a client, Robert M.

---

[2] SCR 20:1.3 provides: "Diligence. A lawyer shall act with reasonable diligence and promptness in representing a client."

[3] SCR 20:1.4(a) provides: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

[4] SCR 20:8.4(c) provides: "It is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

Trotter, Harris failed to act with reasonable diligence and thereby violated SCR 20:1.3.

6. By failing to provide Trotter with even the most rudimentary information about cases in which Trotter's interests were at stake and by failing to respond to numerous inquiries from Trotter and his agents, Harris failed to keep Trotter reasonably informed about the status of pending matters and failed to comply promptly with Trotter's reasonable requests for information. He thereby violated SCR 20:1.4(a).

7. By these same acts and omissions and in particular by failing to advise Trotter of a judgment against Trotter and of a proposed compromise agreement, Harris failed to explain matters to Trotter to the extent necessary to enable Trotter to make informed decisions about the matters involved in Harris's representation and thereby violated SCR 20:1.4(b).[5]

Report and Recommendation of Referee Michael Ash at 14–16 (footnotes added).

¶ 48. The referee recommended that Attorney Harris's license to practice law be suspended for not less than two years. The referee recommended further that Harris be required to pay the costs of this proceeding and that any reinstatement of his license to practice law be conditioned upon:

. . . his satisfying the judgments lodged against Robert M. Trotter in the amount of Two Thousand, six hundred seventeen dollars and seventy-four cents ($2,617.74) and against himself in the same amount; and that, in the event Trotter pays any money in satisfaction of such judgments, Harris reimburse Trotter in full for all such amounts paid, including interest

---

[5] SCR 20:1.4(b) provides: "(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

at the legal rate from the date or dates of any such payment or payments by Trotter.

*Id.* at 16.

¶ 49. Harris engaged in serious misconduct. As the referee observed in his thorough and well-reasoned report: "It is hard to exaggerate how badly Harris abused [his clients'] trust and how reprehensible his conduct was toward these clients." *Id.* The referee considered whether more severe discipline than a two-year suspension might be warranted. Ultimately, the referee decided against recommending more severe discipline, explaining:

> . . . the OLR has recommended a two-year suspension and has cited cases indicating that something less than revocation might be more closely in accord with this Court's past practice." *See Disciplinary Proceedings Against Weber,* 161 Wis. 2d 414, 468 N.W.2d 12 (1991) (three-year suspension); *Disciplinary Proceedings Against Lipske,* 155 Wis. 2d 470, 455 N.W.2d 880 (1990) (two-year suspension); and *Disciplinary Proceedings Against McNeil,* 150 Wis. 2d 581, 441 N.W.2d 748 (1989) (one-year suspension). Finally, in the proceeding before me, Harris interposed no spurious defenses and did not needlessly prolong the inquiry; instead he simply laid down his cards and folded.

*Id.* at 18–19.

¶ 50. We are of the opinion that the referee carefully considered all the aspects of this matter in reaching his final conclusions and recommendations. Accordingly, we adopt the referee's findings and recommendations in this matter, except that we direct Harris to pay the judgment against Mr. Trotter forthwith. Any reinstatement of Harris's license to practice law shall be further conditioned upon his satisfaction of the civil judgment against himself.

¶ 51. IT IS ORDERED that the license of Edward G. Harris to practice law in Wisconsin is suspended for a period of two years, effective the date of this order.

¶ 52. IT IS FURTHER ORDERED that Edward G. Harris comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶ 53. IT IS FURTHER ORDERED that within 60 days of the date of this order Attorney Edward G. Harris shall satisfy the judgment lodged against Robert M. Trotter in the amount of $2617.74. In the event Mr. Trotter pays or has paid any money in satisfaction of this judgment, Attorney Harris shall reimburse Mr. Trotter in full for all such amounts paid, including interest at the legal rate from the date or dates of any such payment or payments by Mr. Trotter. If the judgment is not satisfied within the time specified, and absent a showing to this court of his inability to satisfy the judgment within that time, the license of Attorney Edward G. Harris to practice law in Wisconsin shall remain suspended until further order of the court.

¶ 54. IT IS FURTHER ORDERED that any reinstatement of Attorney Edward G. Harris's license to practice law in Wisconsin shall be conditioned upon his satisfying the judgment lodged against Harris, himself, in the amount of $2617.74.

¶ 55. IT IS FURTHER ORDERED that within 60 days of the date of this order Attorney Edward G. Harris shall pay to the Office of Lawyer Regulation the costs of this proceeding in the amount of $6979.26. If the costs are not paid within the time specified, and absent a showing to this court of his inability to pay the

costs within that time, the license of Attorney Edward G. Harris to practice law in Wisconsin shall remain suspended until further order of the court.